DAVIS MILES McGWIRE GARDNER
Bradley D. Weech (SBN 011135)
Marshall R. Hunt (SBN 031060)
40 E. Rio Salado Parkway, Suite 425
Tempe, Arizona 85281
Telephone: (480) 733-6800
Facsimile: (480)733-3748
  *efile.dockets@davismiles.com*

BLECHER COLLINS & PEPPERMAN, P.C.
Maxwell M. Blecher (Pro hac vice pending)
  *mblecher@blechercollins.com*
Donald R. Pepperman (Pro hac vice pending)
  *dpepperman@blechercollins.com*
515 South Figueroa Street, Suite 1750
Los Angeles, California 90071-3334
Telephone: (213) 622-4222
Facsimile: (213) 622-1656

Attorneys for Plaintiff
Dakota Territory Tours, ACC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Blecher Collins
& Pepperman

BC
&P

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| DAKOTA TERRITORY TOURS, ACC, an Arizona close corporation, | Case No. |
| Plaintiff, | **CIVIL COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR VIOLATIONS OF:** |
| vs. | |
| SEDONA-OAK CREEK AIRPORT AUTHORITY, INC., an Arizona non-profit corporation; GUIDANCE AIR SERVICE, LLC; YAVAPAI COUNTY and AMANDA SHANKLAND, | **(1) SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2); and** **(2) SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)** |
| Defendants. | **[DEMAND FOR JURY TRIAL]** |

Plaintiff Dakota Territory Tours, ACC (dba Sedona Air Tours) ("Dakota"), files this Complaint against defendants the Sedona-Oak Creek Airport Authority, Inc. ("SOCAA"); Guidance Air Services, LLC ("Guidance"); Yavapai County and Amanda Shankland, seeking damages and injunctive relief, and demanding trial by jury, complains and alleges as follows:

## SUMMARY OF THE ANTITRUST CASE

1. Defendant SOCAA manages and controls the Sedona Airport which is owned by defendant Yavapai County. Exercising its monopoly power, the SOCAA has granted an exclusive sublease of operational space at the Sedona Airport to defendant Guidance, a direct competitor of plaintiff Dakota, an incumbent sublease co-tenant. By virtue of this exclusive on-airport sublease for the Sedona Airport facilities, defendant Guidance will now control 100% of the helicopter and fixed wing aircraft tours of Sedona originating and terminating at the Sedona Airport.

2. Denial of access to an airport facility, which forecloses competition and fosters a monopoly, is clearly within the proscription of the antitrust laws, and specifically, the Sherman Act. The refusal of a monopolist to allow competitors, reasonable access to or use of a facility, where there is no procompetitive business justification for the exclusion and where the refusal is motivated solely to preserve monopoly power, violates Section 2 of the Sherman Act. *See, e.g., Image Technical Services, Inc. v. Eastman Kodak Co.,* 125 F. 3d 1195 (9th Cir. 1997); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585 (1985).

3. That is precisely what has occurred here. Defendant SOCAA, as a monopolist over the Sedona Airport has unlawfully blocked all air tour competitors, such as plaintiff Dakota, from meaningful on-airport access to the Sedona Airport by reason of its sham award of an exclusive sublease to defendant Guidance. Defendant Guidance already had an existing on-airport sublease to conduct its competing air tour operations adjacent to the on-airport facilities subleased by plaintiff Dakota. With the SOCAA award of the second sublease to defendant

-1-

Blecher Collins
& Pepperman

BC P

Guidance, Dakota has been exiled and Guidance will emerge as the <u>exclusive</u> air tour operator.  Moreover, Guidance plans to leave that additional space (previously occupied by Dakota as its base of operations) <u>vacant</u> for at least the first year after Dakota's anticompetitive ouster.  This contractual foreclosure of all competition causes Dakota's anticompetitive harm and antitrust injury.

4.     Additionally, the SOCAA, a monopolist, perfected the exclusion of competitors by an exclusive contract with defendant Guidance so as to form an unlawful restraint of the trade and a conspiracy to monopolize in violation of Sections 1 and 2 of the Sherman Act.  Accordingly, each defendant is liable to plaintiff Dakota because the refusal, collectively and separately, to allow plaintiff Dakota (or others) to sublease on-airport facilities at the Sedona Airport to operate air tours offends the Sherman Act.

# I.

## **THE PARTIES**

1.     Plaintiff Dakota Territory Tours, ACC, is an Arizona close corporation (dba Sedona Air Tours) located and doing business in Yavapai County, Arizona.  Dakota is in the business of arranging and providing helicopter and fixed wing air tours out of the Sedona Airport in Sedona, Arizona.  Dakota has continuously operated under an on-airport sublease at the Sedona Airport since Dakota's formation in 2001.  Dakota's predecessors, including its principal shareholder, operated its air tour business at the Sedona Airport for at least ten years before forming Dakota.  The Dakota/Sedona Airport air tour business relationship lasted over 25 years.

2.     Defendant the Sedona-Oak Creek Airport Authority, Inc., is a non-profit corporation organized under Arizona law.  The SOCAA was formed in or about 1970.  The SOCAA purports to be an independent airport authority and is empowered to operate, manage and oversee the Sedona Airport pursuant to a long-term written lease agreement with Yavapai County.  As part of its operations, the

SOCAA enters into and maintains various subleases on buildings, aircraft parking pads, and facilities on the Sedona Airport premises.  The SOCAA purports to have decision-making authority over subleases and controls access to the airport by commercial entities such as plaintiff Dakota.  The SOCAA is governed by a Board of Directors, which includes seven members who are elected for five-year terms with a 10-year limit.  The SOCAA also owns and operates the Sedona Airport's only fixed base operator, Red Rock Aviation, which sells aviation fuel and provides ground support and catering services, aircraft tiedowns and overnight parking, and rental car/limousine services.

3.      Defendant Yavapai County owns the Sedona Airport property, which consists of 260 acres known as Table Top Mountain.  The property was acquired for the specific purpose of  being a "public use" airport into perpetuity.  Yavapai County has a long-term contract with the SOCAA for it to manage the Sedona Airport for the "public good."   The contract also requires and empowers the SOCAA to operate the Sedona Airport in a prudent and businesslike manner, promoting aeronautical activities at the Airport as well as other revenue producing activities, as appropriate.  The current management contract was most recently renewed on February 12, 2003 with terms set to expire on June 30, 2050.

4.      Defendant Amanda Shankland is a resident of Coconino County, Arizona.  Ms. Shankland is currently the General Manager and/or Airport Director of the Sedona Airport acting on behalf of defendant SOCAA since at least 2016.

5.      Defendant Guidance Air Service, LLC (dba Guidance Air Services) is a limited liability corporation with its administrative offices located in Prescott, Arizona.  Since at least September 2016, Guidance has subleased on-airport space adjacent to Dakota at the Sedona Airport from which it operates, among other things, air tours of the Sedona area.  Guidance represents itself as "Sedona's premier helicopter tour operator" and is a direct competitor of plaintiff Dakota for air tours originating out of the Sedona Airport.  Both Guidance and Dakota are licensed Part

Blecher Collins
& Pepperman

-3-

1  135 commercial operators and have safely competed side-by-side from subleased

2  on-airport areas at the Sedona Airport.

## II.

## JURISDICTION AND VENUE

6.  This Complaint is filed and this action is instituted under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) to obtain injunctive relief and to recover the damages caused by the defendants' past and continuing violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2), as alleged herein.

7.  This Court has original and exclusive jurisdiction over the subject matter of this civil action under 28 U.S.C. §§ 1331 and 1337.

8.  Venue in this District is proper because all parties transact business on a systematic and continuous basis within this District, and may be found here, within the meaning of 15 U.S.C. §§ 15, 22 and 28 U.S.C. § 1391.  Further, the unlawful acts alleged herein were performed and occurred in material part within this District.

9.  The transportation of goods and services into and out of Sedona is in the flow of interstate commerce and directly involves and affects interstate commerce.  Products and goods that are manufactured, produced, distributed or sold outside of Arizona are shipped across state lines, to reach the Sedona Airport.  Accordingly, the conduct alleged hereinafter is not only directly in, but also directly restrains and adversely affects such interstate commerce.

## III.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

A.  **The Sedona Airport Monopoly and Lease Agreement Between Defendants SOCAA and Yavapai County**

10.  According to the Sedona Airport's "Master Plan," prepared in or about 2015: "Sedona Airport consists of approximately 220 acres located atop Table Top Mountain overlooking the City of Sedona.  The City of Sedona is a tourist

Blecher Collins
& Pepperman

-4-

1 destination averaging between two and four million tourists per year.  Tourists come

2 to Sedona for outdoor recreation attractions including Oak Creek Canyon with its

3 red-rock formations and riparian areas as well as for the local art galleries and many

4 annual cultural festivals."  Sedona Airport does not presently experience scheduled

5 air carrier operations.  A significant portion of its total operations are primarily

6 associated with its on-airport tenant air tours operators, such as Dakota and

7 Guidance.

8    11.    Currently, there are two on-airport tour operators, Dakota and

9 Guidance, that have subleases and each occupy modular facilities at the Sedona

10 Airport.  In the "Master Plan," the SOCAA envisions: "Helicopter parking positions

11 are a significant portion of existing apron space due to aerial tour activities.

12 Currently, the Airport has 10 designated helicopter parking positions.  Should aerial

13 tour activities increase over time, so will the need for expanded helicopter parking.

14 By the long term, it is estimated that an additional 12 helicopter parking positions

15 (approximately 6,500 square yards) will need to be added."  As air tour activities

16 increase, the Master Plan also suggests and proposes that "it may be more

17 convenient to consolidate the tour operators into the terminal building or construct a

18 separate aerial tour operator terminal.  Being one of the biggest draws of tourists to

19 the Airport, having the tour operators in a new, attractive facility could help increase

20 business and give a better impression of the Airport as a whole."  There is no

21 question that granting exclusivity to defendant Guidance and banishing plaintiff

22 Dakota is wholly inconsistent with defendant SOCAA's own publicly available

23 Master Plan and which was submitted to the Federal Aviation Administration.

24    12.    The Sedona Airport is located within the jurisdictional boundaries of

25 the City of Sedona.  Defendant SOCAA manages and controls the Sedona Airport

26 facility which is owned by defendant Yavapai County.  There is no other airport

27 located in Sedona.  The closest other public-use airport is Cottonwood Airport

28 which is located 14 nautical miles southwest of the Sedona Airport. The SOCAA

Blecher Collins
& Pepperman

BC
&P

Master Plan acknowledges that if Sedona Airport reduced or eliminated services, aviation users "would have to drive considerable distances in order to reach [other] public-use airports."  Further, the SOCAA notes that "[s]hifting servies away from the [Sedona] Airport could hinder the services provided to the City of Sedona and its tourist-driven economy."  There is no business justification for eliminating Dakota as an on-airport air tour competitor and the SOCAA's sham Request for Proposals process described below contradicts the SOCAA's own stated Master Plan for the future and prosperity of the Sedona Airport.

13.    By reason of an exclusive sublease, defendant Guidance as a tenant will now have an absolute 100% on-airport monopoly on air tours of the Sedona area departing from and returning to the Sedona Airport.

14.    The SOCAA-Yavapai County long-term lease requires the SOCAA to operate the Sedona Airport in a prudent and businesslike manner and to promote revenue producing activities. The SOCAA-Yavapai County lease also purports to producing Yavapai County the right to approve all subleases by the SOCAA, without Yavapai County, itself, conducting competitive bidding for such subleases. The SOCAA-Yavapai County lease purports to require the SOCAA to conduct competitive bidding where required by law.  Yet, the SOCAA has entered into many subleases with air tour operators over the years without any competitive bidding. Indeed, none of the current SOCAA subleases at the Sedona Airport were the result of competitive bidding.

**B.    Dakota's Prior Long Term Lease History With the Sedona Airport**

15.    Dakota's most recent sublease with the SOCAA is a commercial activity lease dated September 1, 2012 ("the Dakota Lease").  The Dakota Lease ran for an initial period of 24 months through August 31, 2014.  Prior to the expiration of the initial term of the Dakota Lease, Dakota and the SOCAA through an "Addendum" which extended the Dakota Lease through April 30, 2017.  Pursuant to

Blecher Collins
& Pepperman

1   the settlement agreement described below, since May 1, 2017, Dakota has continued

2   to lease space at the Sedona Airport on a month-to-month basis.

3        16.    Up until the threatened eviction, plaintiff Dakota ran its air tour

4   operations out of subleased on-airport space at the Sedona Airport.  The subleased

5   space included a modular building, a passenger ramp, fuel tank storage area, two

6   helipads, and two airplane tie-down spaces.  Defendant Guidance, since at least

7   September 2016, pursuant to its own sublease with defendant SOCAA, has been a

8   co-tenant similarly using Sedona Airport on-airport facilities to conduct an air tour

9   business.

10  **C.    Earlier Litigation Between Dakota and SOCAA**

11       17.    During the initial term of the Dakota Lease, on or around November

12  13, 2014, Dakota and the SOCAA became involved in litigation in Yavapai Superior

13  Court, Case No. CV2014-80422 (the "Litigation").  Dakota initiated the Litigation

14  based on, among other things, the SOCAA's breach of the Dakota Lease.  During

15  the course of the Litigation, the SOCAA began the process of terminating the

16  Dakota Lease.  On April 27, 2017, the parties settled that Litigation by a written

17  document, which included the SOCAA's agreement (the "Settlement Agreement")

18  to extend the Dakota Lease of the space at the Sedona Airport.  The Litigation was

19  dismissed the next day, April 28, 2017.

20       18.    As an inducement to Dakota, the Settlement Agreement provided that

21  the SOCAA would prepare and issue a Request for Proposals ("RFP") to sublease

22  on-airport operational space (as a tenant) the Sedona Airport then occupied by

23  Dakota, *i.e.* the existing, modular building.

24       19.    The leased space was a used modular building that filled Dakota's air

25  tour needs, including without limitation, a panoramic 270 degree view of the

26  airfield, the terminal, hangers, the Sedona area and countryside.  Dakota has a

27  passenger check-in desk, weigh station, and a passenger waiting room with drinks,

28  food, Dakota/aviation related paraphernalia for customers to purchase, and/or

Blecher Collins
& Pepperman

BC
&P

1    provided by Dakota.  The SOCAA also agreed that Dakota would be allowed to

2    continue to occupy and sublease this space until the RFP was issued to a successful

3    bidder.

4         20.    During settlement discussions, as of April 27, 2017, and, as an

5    inducement to Dakota to settle, the SOCAA affirmatively repeatedly represented

6    that it was only in the initial stages of preparing a RFP.  The SOCAA represented to

7    Dakota that, along with any others, Dakota would be able to provide input to the

8    SOCAA to consider for use in drafting the RFP and also that the SOCAA expected

9    Dakota would be the successful bidder.  The SOCAA also represented, and the

10   Settlement Agreement provides, that if Dakota were the successful bidder in the

11   RFP, a new sublease would issue to Dakota for the existing space (including the

12   modular building) and that Dakota's use of the Sedona Airport on-airport space

13   would not be interrupted.

14        21.    Dakota and the SOCAA also discussed the possibility of an RFP for a

15   long-term lease of <u>other</u> property located at the Sedona Airport where Dakota would

16   construct a new building, which at the end of the lease term, would remain the

17   property of defendant Yavapai County.

18   **D.    <u>Defendant SOCAA Selects Co-Defendant Guidance As the Exclusive On-</u>**

19        **<u>Airport Air Tour Tenant Through a Sham Bidding Process</u>**

20        22.    Contrary to the SOCAA's representations and inducements to settle the

21   Litigation, on May 1, 2017—the very next business day after the dismissal of the

22   above-described Litigation—the SOCAA issued what was clearly a previously-

23   prepared RFP.  In the RFP, the SOCAA sought proposals for "Commercial 135

24   Operations"(commuter and on demand operations) at the Sedona Airport.  The

25   operations were to be located at 1225 Airport Road in the Sedona Airport, the

26   location of Dakota's <u>current</u> subleased space, and to include two helipads/tie downs

27   numbers 1 and 2.  At that time, and through the present, defendant Guidance was

28

Blecher Collins
& Pepperman

1   subleasing similar space at 1200 Airport Road to conduct its competing on-airport
2   air tour operations.

3       23.     The diagram and other information regarding the space in the RFP was
4   not accurate.  As a result, at a May 16, 2017 "RFP pre-submission meeting" Dakota
5   noted the errors in the RFP.  Defendant Ms. Shankland's response was that, contrary
6   to the Settlement Agreement, the RFP was for a different modular building, *i.e.* a
7   modular building that differs substantially from Dakota's currently subleased space.
8   For example, the proposed building lacked the current building's attractive windows
9   providing views of the Sedona Airport and Sedona.  Instead, it had offices on both
10  ends.  Nowhere in the RFP is there any statement that the building is newly
11  constructed, or the age and/or history of the modular building.

12      24.     Other provisions of the RFP included:

13          (a)     a specification that the RFP was for space located at 1225
14  Airport Road, which includes two helipads/tie downs, as identified in Exhibit A1
15  and Attachment A to the RFP.  These exhibits/attachments show a specific building
16  site;

17          (b)     a requirement that the commercial operations were to be
18  "operational within approximately two months of the publishing of th[e] RFP;"

19          (c)     that a bid must "Maximize the Use of th[e] site;"

20          (d)     the "best responsible proponent" was to be the best proponent to
21  "lease and operate commercial 135 operations at the designated site…"; and

22          (e)     "The Authority desires commercial uses which contribute to the
23  economy of the airport . . ."  As noted above, the SOCAA's lease with Yavapai
24  County requires the SOCAA to promote and maximize revenue.

25      25.     In contradiction of the "Master Plan," the RFP stated: "Space for
26  commercial use at the airport is limited."  This statement is not true and was used as
27  a pretext to banish plaintiff Dakota.

28

26.     The RFP also set out certain criteria by which proposals were to be judged, including the dollar amount of proposed rental consideration; the experience of the proposer; and the number of aviation jobs to be retained/created by the proposer.  The RFP also required that the SOCAA Board of Directors, Yavapai County Board of Supervisors and the FAA participate in the selection of the proposals on or before June 2017.

27.     The RFP also stated that any proposal will be subject to FAA review and approval prior to the commencement of any sublease agreement.  This was a false statement by defendant SOCAA.

28.     Because a different modular building was included in the RFP, the RFP was designed in a way that it could not be awarded to Dakota without the SOCAA breaching the Settlement Agreement.  The RFP proposed a different modular building, *i.e.* not the "Premises" specified in the Settlement Agreement.  Moreover, a different modular building would disrupt Dakota's business operations in violation of the Settlement Agreement.  It is Dakota's belief that the SOCAA crafted the RFP in this manner because it never intended to award the RFP to plaintiff Dakota.

29.     Finally, the RFP lacked information necessary for valid requests for proposals.  For instance, the RFP lacked any information regarding designating bid information as confidential, and lacked any requirement to certify that bids did not involve collusion or other anticompetitive practices.  *See* Arizona Administrative Code R2-7-C301(C)(1)(e) and (k).

30.     The RFP process was a sham and the ultimate outcome was rigged by virtue of a pre-determination by the SOCAA calculated to insure that no competitive air tour provider other than defendant Guidance could emerge as the RFP "winner."

31.     At the June 26, 2017 meeting, the SOCAA awarded the RFP to Guidance although Dakota contends it was not a responsive bidder.  As set out above, the RFP requires use of a specific building site within two months of publishing the RFP.  Guidance's bid does not propose to be operational within 2

Blecher Collins
& Pepperman

months of publishing the RFP.  In fact, Guidance's bid expressly states that Guidance does <u>not</u> intend to use the site at all for the <u>first</u> <u>year</u> of the two-year lease contract term.  Further, even in the second year of the two-year lease term, Guidance's bid proposes only that it anticipates negotiating at a later date "additional building space of equal value" to that set out in the RFP.  Apparently, Guidance's plan is to utilize its existing subleased facilities to conduct air tours and leave Dakota's former adjacent space vacant and unused.

32.     As part of defendants' anticompetitive and disruptive eviction of Dakota from its on-airport facilities, defendant SOCAA has also demanded that plaintiff Dakota remove its "mobile fuel tank" that it had previously been permitted to maintain at the Sedona Airport under the sublease.

33.     Defendant Guidance's bid also sought a "first right of refusal" for additional helicopter and airplane tie-down space that was outside the scope of the RFP.  Moreover, the space is the same space that the SOCAA had claimed was unsafe and denied to Dakota in the earlier Litigation, *i.e.* space right outside the area where patrons can view aircraft landings and takeoffs.

34.     Moreover, Dakota's bid proposes a rental rate for the space more than 32% <u>higher</u> than Guidance's bid.  Guidance's bid essentially allows Guidance to pay a discounted rental price to remove Dakota as its sole Part 135 commercial operations competitor from the Sedona Airport, without actually utilizing or occupying the space that was the subject of the RFP.  This sole and exclusive tenant outcome is inefficient, does not maximize revenues, and destroys competition.

**E.**     <u>**Anticompetitive Effect of the Exclusive On-Airport Lease of the Sedona Airport Facilities to Defendant Guidance by Defendant SOCAA**</u>

35.     Guidance's air tour monopoly is facilitated and created by defendant SOCAA's management and control of the Sedona Airport which it has subleased to defendant Guidance on an exclusive basis for a two-year period.

36.     The exclusive SOCAA-Guidance sublease of Sedona Airport described

Blecher Collins
& Pepperman

1   above, was intended to and will ultimately foreclose and end competition (where

2   competition formerly existed) in the provision of on-airport air tours of the Sedona

3   area departing from a returning to the Sedona Airport.  It is this contractual

4   foreclosure of all competition, which causes Dakota's anticompetitive harm and

5   antitrust injury and harms tourists in Sedona.

6   **F.**   **Defendants' Anticompetitive and Exclusionary Conduct**

7       37.   Defendant SOCAA undertook an illegal, deliberate and bad faith

8   course of action to deprive Dakota of its continued lease and to award the RFP to

9   Dakota's side-by-side competitor, defendant Guidance.  This gave Guidance

10  exclusive on-airport air tour operation rights at the Sedona Airport, even though it

11  failed to offer a superior or competitive bid.  Defendant Guidance and plaintiff

12  Dakota were previously co-subtenants conducting simultaneous competitive air tour

13  operations out of the Sedona Airport.  There is no question that the Sedona Airport

14  can safely and profitably sublease space to more than one air tour operator as it has

15  done in the past.

16      38.   On or about May 2, 2017, contrary to the SOCAA's representations,

17  Dakota learned that the SOCAA had published a pre-prepared RFP without

18  Dakota's input.  When Dakota inquired, the SOCAA misrepresented that both

19  defendant Yavapai County and the FAA had "approved" the RFP.  Dakota then

20  requested the names of the individuals at both entities who had approved.  The

21  SOCAA disingenuously reported that they did not know who at the FAA or Yavapai

22  County had approved the RFP process or form.  In fact, the SOCAA's primary

23  contact at the FAA later denied approving the RFP.  Additionally, while claiming

24  the SOCAA did not know the name of the individual(s) at Yavapai County who

25  "approved" the RFP, the SOCAA gave sufficient information for Dakota to locate

26  Jack Fields, Assistant Administrator, who denied any involvement beyond a partial

27  review and cursory suggestion of some general language for the RFP.

28

39.     As alleged, the RFP makes no mention that the space to be subleased was not the subject of the RFP, and that a different building was intended.  Only when questioned at the May 16, 2017 RFP pre-submission meeting, did Ms. Shankland disclose that the RFP was not for a continued lease of the Premises as required by the SOCAA/Dakota Settlement Agreement.  At the May 16, 2017 pre-submission meeting, a non-mandatory meeting for potential RFP responders, Ms. Shankland stated that any questions asked there or by email would be posted for the public, and, particularly, and potential bidders to see, so that all would have the same information.  The next day, May 17, 2017, Ms. Shankland received an email from an attendee at the pre-submission meeting, which asked "one additional question" concerning whether the financial data requested by the RFP would be public record.

40.     That same day, Ms. Shankland responded that she would check, and then further volunteered that: "Also, my apologies for the tense meeting yesterday.  Please be assured our team is a great bunch and we love aviation."  Since Dakota representatives were the only other persons who spoke at the meeting, Ms. Shankland was apparently being derogatory about Dakota, and expressed bias against Dakota.  When Ms. Shankland failed to respond, another email was sent, to which Ms. Shankland responded:  "I have asked our attorneys to clarify this because, it is very important to me to have propriety and SSI protected.  They indeed said that the financial information can be confidential.  Also this will not be discussed during a public meeting.  The determination will be internally [sic]and not public or recorded.  The only public piece will be the opening of the bids and approval of a lease between SOCAA and the tenant."  Ms. Shankland did not publish either this question or her response on the website, as she had previously represented.

41.     Instead, for the first time, at the June 26, 2017 SOCAA Board meeting to vote on and decide the RFP sublease winner, Ms. Shankland stated, at least for

Blecher Collins
& Pepperman

the first time to Dakota, that much of the information submitted would not be a part of the SOCAA's "Procurement File" which was to be available on June 28, 2017. Dakota had already submitted a statutory document request for this information, which Ms. Shankland had promised, before the June 26, 2017 meeting, in writing, to provide on or before June 28, 2017.  The full "Procurement File" was, in fact, not timely provided.

42.    An email on July 6, 2017 from an attorney for the SOCAA, Kiersten Murphy, on behalf of the SOCAA relayed a false claim that:  "Consistent with the Authority's position at the pre-bid conference, neither company's Business & Marketing Plans and Financial Data are publicly available, as those attachments contained confidential and/or proprietary information.  All parties in attendance at the pre-bid conference were aware of and accepted this position prior to submitting their offers."  This statement came from Ms. Shankland and was not true.

43.    Plaintiff Dakota made a responsive bid to the RFP within the time frame required by the RFP process as dictated by the SOCAA.  Dakota asserts it was the only legitimate responsive bidder.

44.    On June 26, 2017, the date specified to choose the "best responsible proponent," the SOCAA purported to adopt a "Protest Policy" to govern protests of the RFP and/or of the award to a successful bidder.  The SOCAA did so, already knowing that, in this case, the Protest Policy would only apply to Dakota.  The Protest Policy purports to require protests of deficiencies apparent from the face of the RFP to be made prior to the award of the RFP.  The SOCAA, however, never published a Protest Policy and did not adopt it until just seconds before they awarded the RFP to defendant Guidance.  The SOCAA adopted the Protest Policy to attempt to shield its RFP award from protest from Dakota.

45.    At the June 26, 2017 meeting, the SOCAA also revealed that a "selection committee" and the SOCAA Board altered the selection criteria set out in the original RFP.  Indeed, the SOCAA disclosed that the committee that scored the

1    proposals had used a scoring matrix for the proposals that varies materially from the

2    criteria set out in the RFP.  For instance, the SOCAA's scoring matrix failed to

3    consider jobs created/retained at the airport (as required by the RFP), and introduced

4    new criteria such as "previous litigation with airports" and "Community Relations"

5    not set out in the RFP.  These criteria were specifically changed to disadvantage

6    Dakota and disfavor its bid.  Dakota has repeatedly requested that the SOCAA

7    identify the individuals who served on the "committee," but the SOCAA has failed

8    to do so.  At the June 26, 2017 meeting, the SOCAA announced that there were only

9    two responsive bidders: Dakota and Guidance.

10    46.    The SOCAA, has also refused to produce Guidance's full bid,

11    including contract terms, conditions and pricing information related to Guidance's

12    bid.  The SOCAA has sought to justify its refusal by falsely claiming that Guidance

13    and Dakota agreed at a pre-bid selection meeting in May 2017 to keep proprietary

14    business information submitted with the proposers' bids confidential.  There was

15    never such an agreement, and the SOCAA, likely Ms. Shankland, knew there was

16    not when that claim was made.  Nor, could the relevant information be confidential

17    as it constitutes "contract terms and conditions" and "pricing information" and is

18    therefore expressly not confidential as set out in A.A.C. R2-7-103.

19    47.    Both during and following the June 26, 2017 proceedings, Dakota

20    experienced and/or discovered several further anticompetitive actions by the

21    SOCAA with regard to the RFP.  For example, at least one qualified service

22    technician who previously worked for the Sedona Airport has provided a written

23    statement to Dakota confirming that even prior to the completion of the bidding

24    process, the SOCAA management discouraged several of their employees from even

25    applying to work for Dakota.  The SOCAA management included Damon Anderson

26    and defendant Amanda Shankland.  Even as of July 6, 2017, before any RFP protest

27    period passed, Ms. Shankland stated that employment with Dakota would likely be

28    very short lived, *i.e*, two weeks, because Dakota would be out of its current Sedona

Blecher Collins
& Pepperman

Airport location by July 26, 2017.  When asked whether Dakota could use offices outside the Sedona Airport and still land and takeoff from the Sedona Airport, she stated that the SOCAA planned to charge Dakota landing fees every time they touched down.  The financial nature of Dakota's business is such that the number of landings/takeoffs times the fee that the SOCAA charges will be cost prohibitive. The same technician stated that Ms. Shankland volunteered to him that she was hired by the SOCAA not just to run the Sedona Airport, but also "get [Dakota] out of the airport."

48.     The SOCAA's anticompetitive intent is also demonstrated by Mr. Nelson Durkee's (Sedona Airport Business Manager) statement.  As a voting member of the "committee," Mr. Durkee stated to other members that Guidance's bid was substantially <u>lower</u> than Dakota's bid and expressed his concern about the SOCAA's intent to award the bid to Guidance given Dakota's substantially superior bid from a financial standpoint.  Mr. Durkee has also commented that the other attendees at the meeting concurred that as a result of their awarding the bid to Guidance, it would force Dakota out of business, and Guidance would get "all of Dakota's customers."

49.     Further, within only seven minutes of the end of the June 26, 2017 meeting where the SOCAA Board supposedly reviewed the undisclosed committee's recommendation and then publicly "voted" to award the bid to Guidance as the best responsive bidder, the SOCAA (through counsel) sent a pre-prepared letter by email to four different addresses demanding that Dakota vacate its leased space at the Sedona Airport within 30 days by July 26, 2017.  This demonstrates that the SOCAA never intended to award the RFP to Dakota.  Instead, the SOCAA prepared a notice to terminate the Dakota Lease <u>prior</u> to the meeting in which the "vote" to award the bid to Guidance, Dakota's only on-airport air tour competition at the Sedona Airport.  Exclusivity was granted to Guidance without any required compelling public policy for exclusivity.

50.     The very next morning following the June 26, 2017 meeting and award of a lease and license to defendant Guidance, SOCAA employees began disparaging Dakota to Dakota's own employees and encouraging them to quit their employment with Dakota and to seek a job with Guidance.  On June 27, 2017, SOCAA employee Brandi Phillips, talked to at least two Dakota employees, telling them to apply for work with Guidance, because Dakota "may not be around much longer" and that they "should go to work for Guidance Air . . . a great company and can offer . . . a good job opportunity."

51.     Moreover, despite the purported requirements of the RFP, the Yavapai County Board of Directors and FAA did <u>not</u> participate in granting the award to Guidance.  No one from either entity was present at the June 26, 2017 meeting.

52.     On July 20, 2017 Dakota submitted a written "protest" to the SOCAA concerning the award of a sublease contract to defendant Guidance and Dakota's eviction from the Sedona Airport.  On July 24, 2017, defendant Amanda Shankland issued her (Sedona Airport Director's) written "decision" denying "Dakota's protest in its entirety."  On August 3, 2017, Dakota appealed that decision to the SOCAA Board.

53.     On July 21, 2017, Dakota filed a Complaint and Special Action against the SOCAA and Ms. Shankland in the Yavapai County Superior Court alleging various state law based claims and seeking damages and injunctive relief.  On July 24, 2017, the Honorable John Napper granted a temporary restraining order prohibiting Dakota's eviction until its application for preliminary injunction can be heard.  The state court case does not assert any antitrust claims.

54.     On-airport competition for air tours to and from the Sedona Airport is both desirable and feasible.  Plaintiff Dakota (and its predecessors) has conducted air tour business operations out of the Sedona Airport for at least the past 25 years. The anticompetitive ouster of plaintiff Dakota from its subleased on-airport facilities

at the Sedona Airport has now left defendant Guidance as the sole air tour competitor.

55.     The refusal of defendants to share the facilities at the Sedona Airport necessary for plaintiff Dakota to continue its on-airport air tour operations is an act in restraint of trade and unlawful conspiracy to monopolize because it is intended to, and does eliminate, and foreclose competition and harms consumers.

### IV.

### CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**(Monopolization By Refusal to Deal and Conspiracy to Monopolize In Violation of Section 2 of the Sherman Act)**

**(15 U.S.C. § 2)**

**(Against All Defendants)**

56.     Plaintiff Dakota incorporates by reference the allegations of the preceding paragraphs of this Complaint, as though fully set forth herein.

57.     Section 2 of the Sherman Act (15 U.S.C. § 2) prohibits, *inter alia*, the willful monopolization of any part of the trade or commerce among the States and any conspiracy to achieve monopolization.  Defendants' conduct and practices are anticompetitive, predatory and/or exclusionary.

58.     Plaintiff  has the requisite standing to assert antitrust claims against defendants because it is a participant and competitor in the relevant market for air on-airport tours from the Sedona Airport and would continue to lease the necessary facilities at the Sedona Airport if not for defendants' unlawful and exclusionary conduct.

59.     The relevant product/service market for antitrust purposes in this case is on-airport air tours originating from and returning to the Sedona Airport.  The relevant geographic market is the Sedona area.  Tourists and other entities/persons

desirous of booking and being a part of a Sedona area air tour reasonably and practicably turn to the Sedona Airport as the situs.

60.     Defendants are engaged in a conspiracy to monopolize by engaging in an anticompetitive and exclusionary scheme, including the exclusive written lease between SOCAA and Guidance for use of the Sedona Airport on-airport facilities, to preclude competition in the relevant market, as described more fully herein.

61.     SOCAA/Guidance have a monopoly over air tours of Sedona as they control 100% of all air tours to and from the Sedona Airport through the exclusive control of the Sedona Airport on-airport facilities.  Thus SOCAA/Guidance have a monopoly on all air tours originating from and terminating at the Sedona Airport.

62.     Defendants have undertaken their conspiratorial and collusive anticompetitive and exclusionary conduct with the purpose of monopolizing, with the deliberate and specific intent to monopolize airport service to and from the Sedona Airport and specifically to eliminate, destroy or foreclose meaningful competition in the relevant market by refusing Dakota continued on-airport access to necessary Sedona Airport facilities.  Through this exclusionary conduct defendants have secured a hammerlock on Sedona on-airport air tours and can charge supra-competitive prices.

63.     Tourists in Sedona have been deprived of the choice between on-airport air tour operators on the basis of price, quality, safety, reliability, or any other criteria.  Competition in the market for Sedona air tours would lower the price of air tours, which would in turn might attract more tourists to Sedona and benefit the economy.

64.     Significant and high barriers to market entry exist in the form of regulations, licensing, insurance premiums, high capital investment including helicopters, airplanes, equipment, maintenance, fuel, pilots and staff, and defendants' monopolies.  These significant barriers discourage new entry into the relevant market.

65.     Defendants, acting collectively, possess and have wielded monopoly power in the relevant market to control prices and/or exclude competition.

66.     Defendants' monopoly position in the relevant market has been acquired and maintained through intentional exclusionary and predatory conduct, as opposed to business acumen, accident, or by virtue of offering a superior product or service, greater efficiency, or lower prices.

67.     There is no legitimate business justification for the SOCAA/Guidance's refusal to provide reasonable access to plaintiff Dakota to the Sedona Airport on-airport facilities.  The SOCAA/Guidance's asserted justifications are merely pretextual and the anticompetitive effects of these restraints outweigh any purported beneficial effects on competition.

68.     Defendants' anticompetitive acts have caused, and will continue to cause, substantial economic injury and disruption to plaintiff Dakota's on-airport air tour operations and have also injured competition in the relevant market by, *inter alia*, foreclosing, lessening and eliminating potential competition and depriving consumers from securing competitive on-airport air tours of Sedona and lower prices.

69.     The aforesaid collective conduct of defendants has produced antitrust injury to Dakota, competition and consumers, and unless enjoined by this Court, will continue to produce at least the following anticompetitive, exclusionary and injurious effects upon competition in interstate commerce:

(a)     competition for air tours in the relevant market has been substantially and unreasonably restricted, lessened, foreclosed and eliminated, and consumers will be forced to pay supra-competitive prices for air tours;

(b)     the creation and maintenance of significant and insurmountable barriers to entry, thereby ensuring continued unlawful maintenance of defendants' monopolies; and

Blecher Collins
& Pepperman

(c)     consumers have been deprived of any meaningful choice as to selection, price, convenience, location and quality of Sedona air tour services.

70.     By reason of, and as a direct and proximate result of defendants' anticompetitive and exclusionary practices and conduct, plaintiff Dakota has suffered, and will continue to suffer, financial injury and disruption to its business and property.  Dakota has not yet calculated the precise extent of its past damages and cannot now estimate with precision the future damages that continue to accrue, but when Dakota does so, it will seek leave of the Court to insert the amount of the damages sustained herein.

71.     Specifically, as a direct and proximate result of defendants' continued and willful collective and combined monopolization and misuse of monopoly power, Dakota is being and will continue to be irreparably injured by and through the following: (a) the loss of revenue and profits that would otherwise have been earned from providing air tours to actual and potential customers; (b) the loss of market share that would otherwise have been achieved by Dakota in a freely-competitive market; and (c) the loss of good will and value as a going concern.

## SECOND CAUSE OF ACTION

**(Exclusive Dealing Arrangements to Deny Access to Plaintiff Dakota to Sedona Airport On-Airport Facilities In Violation of Section 1 of the Sherman Act)**

**(15 U.S.C. § 1)**

**(Against All Defendants)**

72.      Plaintiff Dakota incorporates by reference the allegations of the preceding paragraphs of this Complaint, as though fully set forth herein.

73.     Section 1 of the Sherman Act (15 U.S.C. § 1) prohibits, *inter alia*, contracts, agreements or arrangements that unreasonably restrain competition to the detriment of consumers.

74.     Defendants entered into and engaged in an unlawful agreement in restraint of the trade and commerce.  The written lease contract between defendants

Blecher Collins
& Pepperman

BC
& P

SOCAA and Guidance for use of the additional Sedona Airport on-airport facilities explicitly provides for exclusivity.  Defendants' exclusive dealing arrangement forecloses competition and constitutes an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

75.     The relevant product/service market for antitrust purposes in this case is on-airport air tours originating from and retuning to the Sedona Airport.  The relevant geographic market is the Sedona area.  Tourists and other entities/persons desirous of booking and being a part of a Sedona area air tour reasonably and practicably turn to the Sedona Airport as the situs.

76.     The coordinated, collusive, and collective actions of defendants SOCAA/Guidance have the purpose and effect of eliminating or substantially restricting competition in the market for on-airport air tours to and from the Sedona Airport and raising the price of air tours above competitive levels.  The SOCAA/Guidance's exclusive lease of the Sedona Airport facility is an exclusive dealing arrangement with the purpose, effect, tendency and capacity to, among other things, substantially foreclose (if not eliminate all) competition in the market for air tours of Sedona departing from and returning to the Sedona Airport and maintain the SOCAA/Guidance monopoly.  Other air tour operators, such as plaintiff Dakota, would like to lease Sedona Airport facilities but are precluded from doing so by virtue of the SOCAA/Guidance exclusive dealing arrangement.

77.     The actual and probable effect of SOCAA/Guidance's illegal arrangements has been to raise prices above the competitive level and substantially lessen, if not completely foreclose, competition in the air tour market while maintaining SOCAA/Guidance's monopoly of this market.  Defendants possess monopoly power in this defined relevant market and have used, and, continue to use, an exclusive contract to raise barriers to entry and foreclose actual and potential competition.  This arrangement has had, and will continue to have, the effect of unreasonably restraining and eliminating competition in the Sedona air tour market.

Blecher Collins & Pepperman

It is likely that the SOCAA/Guidance exclusive lease agreement will be an evergreen arrangement and will be renewed for the long-term.

78.     There is no legitimate business justification for SOCAA/Guidance's exclusive dealing arrangement.  The anticompetitive effects of this restraint outweigh any purported beneficial effects on competition.  Indeed, this exclusive agreement eliminates all competition where healthy competition previously existed.

79.     Defendants' conduct has produced actual and antitrust injury to plaintiff Dakota, competition and consumers including a substantial foreclosure or elimination of competition in the relevant market, the creation and maintenance of significant barriers to entry, and consumers have been deprived of any choice between air tour operators and will be forced to pay supra-competitive prices for on-airport air tours of Sedona.

80.     By reason of, and as a direct and proximate result of, SOCAA/Guidance's exclusive dealing contract in restraint of trade, plaintiff Dakota has been injured in its business and property, including but not limited to the loss of profits, actual and potential customer base, goodwill, market value and market share.  Consumers have also been harmed by the unreasonable and substantial restriction of competition for the provision of Sedona air tours, eliminated consumer choice and price competition for such services, and consumers' reduced access to plaintiff's competitive air tour services.  Dakota has not yet calculated the precise extent of its past damages and cannot now estimate with precision the future damages that continue to accrue, but when Dakota does so, it will seek leave of the Court to insert the amount of the damages sustained herein.

81.     As a direct and proximate result of defendants SOCAA/Guidance's exclusive contract in restraint of trade, consumers have been deprived of the full benefits of competition in the relevant market.

Blecher Collins
& Pepperman

B C
& P

**RELIEF REQUESTED**

WHEREFORE, plaintiff Dakota requests the entry of judgment against defendants as follows:

1.      That the conduct of defendants be adjudged to violate Section 2 of the Sherman Act (15 U.S.C. § 2);

2.      That the conduct of defendants be adjudged to violate Section 1 of the Sherman Act (15 U.S.C. § 1);

3.      That plaintiff Dakota recover treble the amount of its actual damages sustained from defendants by reason of the foregoing violations of federal antitrust laws (15 U.S.C. § 15);

4.      That defendants be ordered to allow plaintiff Dakota reasonable and non-discriminatory access to and use of  Sedona Airport on-airport facilities so as to enable Dakota to continue its air tour operations and restore competition in the relevant market (15 U.S.C. § 15);

5.      That plaintiff Dakota be awarded its reasonable attorneys' fees and costs of litigation; and

6.      That this Court provide such other and further relief as may be just and proper.

Dated:  August 16, 2017              DAVIS MILES McGWIRE GARDNER
                                     Bradley D. Weech
                                     Marshall R. Hunt



                                     By: _____
                                              */s/ Bradley D. Weech*
                                            Bradley D. Weech
                                           Attorneys for Plaintiff
                                        Dakota Territory Tours, ACC

Blecher Collins
& Pepperman

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  August 16, 2017

BLECHER COLLINS & PEPPERMAN, P.C.
Maxwell M. Blecher
Donald R. Pepperman


By:    _____/s/ Maxwell M. Blecher_____
Maxwell M. Blecher
Attorneys for Plaintiff
Dakota Territory Tours, ACC

Blecher Collins
& Pepperman

-25-

1

## **DEMAND FOR JURY TRIAL**

2       Plaintiff Dakota Territory Tours, ACC hereby demands trial by jury pursuant

3 to the Federal Rules of Civil Procedure, Rule 38(b).

4

5 Dated:  August 16, 2017        DAVIS MILES McGWIRE GARDNER

6                                               Bradley D. Weech
                                                 Marshall R. hunt

7

8

9                                     By: _____
                                                      */s/ Bradley D. Weech*

10                                            Bradley D. Weech
                                                 Attorneys for Plaintiff

11                                         Dakota Territory Tours, ACC

12

13 Dated:  August 16, 2017        BLECHER COLLINS & PEPPERMAN, P.C.

14                                               Maxwell M. Blecher
                                                 Donald R. Pepperman

15

16

17                                     By: _____
                                                      */s/ Maxwell M. Blecher*

18                                            Maxwell M. Blecher
                                                 Attorneys for Plaintiff

19                                         Dakota Territory Tours, ACC

20 91360.2

21

22

23

24

25

26

27

28

Blecher Collins
& Pepperman