**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Dakota Territory Tours ACC, et al., | No. CV-17-08162-PCT-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| Sedona-Oak Creek Airport Authority Incorporated, et al., | |
| Defendants. | |

**INTRODUCTION**

Dakota Territory Tours ACC ("Dakota") is a company that offers helicopter tours in northern Arizona. For years, Dakota subleased space at the Sedona Airport and ran its tours from that location. In 2014, Dakota became embroiled in litigation concerning its lease with the Sedona Oak-Creek Airport Authority, Inc. ("SOCAA"), the non-profit entity that operates the airport on behalf of Yavapai County ("the County"). In 2017, the parties entered into settlement agreement to resolve that litigation. Among other things, the settlement agreement terminated Dakota's sublease but required SOCAA to issue a request for proposal ("RFP") so that interested parties, including Dakota, could submit new bids to use space at the airport. Dakota submitted a bid in response to the RFP but its bid wasn't accepted. Instead, SOCAA accepted a competing bid from Guidance Air Service, LLC ("Guidance"), a rival helicopter tour operator that already leased other space at the airport.

In their amended complaint, which was filed in August 2018, Dakota and Solid Edge Aviation (collectively, "Plaintiffs") allege the RFP process was a "sham" designed to

exclude Dakota from the airport.  Among other things, Plaintiffs allege that SOCAA altered the selection criteria at the last moment in an effort to disadvantage them, accepted Guidance's bid even though it was 32% lower than theirs, refused to produce Guidance's full bid during a subsequent bid protest, presented false testimony during a state-court hearing related to the bid protest, conducted a pretextual audit of their taxes, and lodged a false complaint about their operations with the Federal Aviation Administration.

Although Plaintiffs have raised troubling allegations about how the RFP process was conducted, this case does not involve a challenge to that process in the traditional sense (ordinarily, bid protests alleging improprieties in RFP processes are governed by state law and brought in state court).  Instead, the amended complaint asserts antitrust claims against four different defendants: SOCAA, SOCAA's former director Amanda Shankland ("Shankland"), Guidance, and the County (collectively, "Defendants").

Plaintiffs have now voluntarily dismissed their claims against SOCAA, Shankland, and Guidance (Doc. 115), but their claims against the County remain pending.  The County has moved for judgment on the pleadings (Doc. 79) and, as discussed below, its motion will be granted for two independent reasons.  First, time and again over the last half-century, plaintiffs have attempted to bring antitrust claims against airports and airport operators under the theory that the airport's refusal to provide a lease (or similar concession) amounted to anticompetitive conduct and/or contributed to monopolization. The courts have, almost without exception, rejected such lawsuits because (1) municipal airports generally enjoy immunity from antitrust liability in this context pursuant to the so-called "state action" doctrine, which was first established in *Parker v. Brown*, 317 U.S. 341 (1943), and (2) run-of-the-mill bid protests can't, in any event, be repackaged as antitrust claims.  These principles generally doom Plaintiffs' attempt to transform their dissatisfaction with the RFP process into an antitrust lawsuit.

Second, the amended complaint is devoid of any plausible allegation that the County was responsible for transforming the RFP process into a sham.  Thus, although the County perhaps could have exercised more care in overseeing how SOCAA was administering the

RFP process, Plaintiffs have not articulated facts that would permit the County to be sued under a conspiracy theory. It is a tertiary player in this dispute—Plaintiffs' true dispute lies with SOCAA, and that dispute doesn't sound in antitrust law.

**BACKGROUND**

I. Procedural Background

In August 2017, Dakota filed its original complaint. (Doc. 1.)

In July 2018, the Court issued a pair of orders rejecting Dakota's claims against the County and Guidance. (Docs. 68, 69.) First, the Court concluded the County was entitled to judgment on the pleadings because its "only involvement in this matter is as owner of the Sedona Airport and landlord to SOCAA. . . . [Dakota] has not demonstrated that Yavapai County meaningfully participated in the RFP process that awarded the sublease to Guidance. . . . Yavapai County was not involved in SOCAA's decision-making process and was a passive lessor during the RFP process." (Doc. 69 at 4-5.)[1] Second, as for Guidance, the Court similarly concluded that although Dakota "alleges that SOCAA came up with the plan to replace [Dakota] with Guidance . . . at no point does [Dakota] allege that Guidance colluded with SOCAA to do so." (Doc. 68 at 3-5.) The Court further concluded that Dakota's allegations "demonstrate that Guidance was not involved in SOCAA's decision-making process and was a passive bidder during the RFP process" and that Dakota was seeking to improperly "blame[] Guidance for actions that, even if taken as true, could only have only been plausibly committed by SOCAA." (Doc. 68 at 3-5.)

In August 2018, Dakota, along with new plaintiff Solid Edge, filed an amended complaint alleging violations under sections 1 and 2 of the Sherman Act against all Defendants. (Doc. 72.)

In September 2018, Defendants filed a trio of dispositive motions: the County filed a renewed motion for judgment on the pleadings (Doc. 79), Guidance filed a motion to dismiss under Rule 12(b)(6) (Doc. 80), and SOCAA and Shankland filed a separate motion

---

[1] The Court also concluded that, to the extent Dakota was asserting a claim for money damages against the County, that claim was barred by the Local Government Antitrust Act. (Doc. 69 at 3-4.)

- 3 -

| | |
|---|---|
| 1 | to dismiss under Rule 12(b)(6) (Doc. 81). |
| 2 | In October 2018, this case was transferred to the undersigned judge. (Doc. 94.) |
| 3 | In November 2019, the three dispositive motions became fully briefed. (Docs. 85, |
| 4 | 88, 89, 99, 100, 101.) |
| 5 | On April 4, 2019, the Court issued an order setting oral argument on the dispositive |
| 6 | motions on April 10, 2019. (Doc. 110.) |
| 7 | On April 9, 2019, Plaintiffs filed a stipulation dismissing their claims against |
| 8 | SOCAA, Shankland, and Guidance without prejudice. (Doc. 115.) |
| 9 | On April 10, 2019, the Court heard oral argument on the County's motion. During |
| 10 | the argument, Plaintiffs asked the Court to defer ruling on the motion because the parties |
| 11 | were hoping to finalize a settlement within the next week. The County disagreed and asked |
| 12 | the Court to rule on the motion because the potential settlement was still tentative. |

II. <u>Factual Allegations In The Amended Complaint</u>

A. **The Parties**

Dakota operates helicopter and fixed wing air tours out of the Sedona Airport. (Doc. 72 ¶ 5.) Solid Edge has common ownership with Dakota and serves as Dakota's Part 135 Operating Company. (*Id.* ¶ 6.)

Guidance, like Dakota, operates air tours out of the airport and "is a direct competitor of . . . Dakota." (*Id.* ¶ 10.)

SOCAA is a non-profit corporation that "purports to be an independent airport authority and is empowered to operate, manage and oversee the Sedona Airport pursuant to a long-term written lease agreement with Yavapai." (*Id.* ¶ 7.) SOCAA maintains subleases on buildings, aircraft parking pads, and facilities on the airport premises. (*Id.*) It also owns and operates the airport's only fixed base operator, Red Rock Aviation. (*Id.*) The airport is operated according to a Master Plan. (*Id.* ¶¶ 15-16.)

Shankland was the General Manager and/or Airport Director of the airport acting on behalf of SOCAA since at least 2016. (*Id.* ¶ 9.)

The County, which owns the airport, has a long-term contract with SOCAA under

which SOCAA must manage the airport for the "public good" and in a prudent and businesslike manner. (*Id.* ¶ 8.)

B. **Dakota's Sublease with SOCAA and Litigation Involving the Sublease**

Plaintiffs had a sublease with SOCAA that originally ran until August 2014 and was later extended until April 2017. (*Id.* ¶ 24.) Plaintiffs ran their air tour operations out of the subleased on-airport space. (*Id.* ¶ 25.)

In November 2014, Plaintiffs and SOCAA became involved in litigation over, among other things, SOCAA's breach of the sublease. (*Id.* ¶ 30.)

On April 27, 2017, the parties settled the litigation. (*Id.* ¶ 34.) The settlement agreement provided that SOCAA would prepare and issue an RFP to sublease on-airport operational space that had been occupied by Plaintiffs. (*Id.* ¶ 35.)

While the lawsuit was pending, there were email communications between SOCAA and certain County officials. On March 14, 2017, SOCAA's President Giorgio Cagliero ("Cagliero") sent an email to County Supervisor Randy Garrison ("Garrison") in which he suggested a meeting to address SOCAA's "problem tenant," which presumably referred to Dakota. (*Id.* ¶ 32.) The email stated there had been "developments in the litigation that [] could be better addressed by a joint Airport Authority/Yavapai County team." (*Id.*) The email further suggested that Cagliero, Shankland, and two SOCAA board members meet with Garrison, another individual, and the County Attorney sometime in the following two weeks. (*Id.*)

C. **The "Sham" Bidding Process**

Although SOCAA had represented to Plaintiffs that they could have input into drafting the RFP, the day after settlement, SOCAA transmitted an RFP to a County official, Assistant Administrator Jack Fields ("Fields"), for review. (*Id.* ¶¶ 37, 40.) Fields suggested some general language and SOCAA issued the RFP later that same day. (*Id.* ¶ 40.)

The RFP was for a different modular building than had been indicated in the settlement agreement. (*Id.* ¶ 46.) It also lacked information necessary for valid RFPs. (*Id.*

¶ 47.) And, during the meeting at which voting on the RFP took place, SOCAA altered the selection criteria in a way that disadvantaged Plaintiffs. (*Id.* ¶ 67.)

Guidance was awarded the RFP (the "SOCAA-Guidance Sublease") even though Guidance did not intend to use the subleased space within two months of the RFP's publication, as required by the RFP. (*Id.* ¶ 50.) Also, Guidance's bid was 32% lower than Plaintiffs' bid. (*Id.* ¶ 55.)

The County and the FAA did not participate in the initial award decision, and no one from either entity was present at the meeting awarding the RFP to Guidance. (*Id.* ¶ 73.)

In approving the SOCAA-Guidance Sublease, the County ignored material terms of the Master Lease. (*Id.* ¶¶ 88, 89.)

Within seven minutes after the meeting awarding the RFP to Guidance, SOCAA's counsel sent a letter demanding that Dakota vacate its leased space at the airport. (*Id.* ¶ 71.)

D. **Subsequent Activity**

SOCAA told Plaintiffs that the County and the FAA approved the RFP, so Plaintiffs requested the names of the individuals involved in the approval. (*Id.* ¶ 60.) SOCAA claimed it didn't know the names, but Plaintiffs located Fields, who denied any involvement beyond a partial review and suggestion of general language. (*Id.*)

SOCAA has refused to produce Guidance's full bid, in violation of the law, falsely claiming that Guidance and Plaintiffs had agreed to keep this information secret. (*Id.* ¶ 68.)

Plaintiffs discovered after the bid-selection meeting that even before the RFP had been awarded, SOCAA had discouraged employees from applying to work for Plaintiffs. (*Id.* ¶ 69.)

Plaintiffs submitted a written protest on July 20, 2017. (*Id.* ¶ 74.) In her written decision denying this protest, Shankland asserted the airport could not support more than one operator, which directly contradicted the Master Plan. (*Id.* ¶ 76.)

On July 21, 2017, Plaintiffs sued SOCAA and Shankland in Arizona state court. (*Id.* ¶ 78.) The court in that case granted a temporary restraining order ("TRO") prohibiting Dakota's eviction. (*Id.*) At a later hearing to determine whether to leave this TRO in place,

SOCAA contended that Plaintiffs were not qualified to bid on the sublease because they were not authorized to conduct Part 135 operations. (*Id.* ¶ 81.) To support this argument, SOCAA presented an alleged independent consultant to provide expert testimony on compliance. (*Id.* ¶ 82.) Neither the expert nor SOCAA revealed that the expert worked for Guidance. (*Id.* ¶ 83.)

SOCAA has also subsequently engaged in other conduct favoring Guidance over Plaintiffs, including bringing a forcible entry and detainer action to eject Solid Edge from the subleased space, but not bringing a similar action against any related businesses that Guidance uses. (*Id.* ¶ 90.) SOCAA also audited Plaintiffs for certain taxes but did not audit Guidance in the same way. (*Id.* ¶ 94.)

"SOCAA and/or Guidance" called the FAA hotline to complain that Plaintiffs were not authorized to conduct Part 135 operations, which resulted in an investigation and a decision that the complaints were unsubstantiated. (*Id.* ¶ 93.)

### E. **Effect of the SOCAA-Guidance Sublease**

The amended complaint alleges that the relevant product/service market for antitrust purposes in this case is on-airport air tours originating from and returning to the Sedona Airport. (*Id.* ¶¶ 101, 117.) The relevant geographic market is the Sedona area. (*Id.* ¶¶ 101, 117.)

The amended complaint further alleges that significant and high barriers to market entry exist in the form of regulations, licensing, insurance premiums, and high capital investment, which discourage new entry into the market. (*Id.* ¶ 106.)

Shankland has indicated that SOCAA would charge Plaintiffs a fee for every takeoff and landing, which at the moment would require Plaintiffs to pay at least an additional $45,000 per month to conduct business as an off-airport air tour provider, which effectively excludes Plaintiffs from conducting air tours from the Sedona airport. (*Id.* ¶ 22.)

### **LEGAL STANDARD**

"[T]o survive a motion to dismiss, a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *In re Fitness*

*Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal,* 556 U.S. at 679-80. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 679. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

A motion for judgment on the pleadings under Rule 12(c) is "functionally identical" to a Rule 12(b)(6) motion to dismiss. *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 n.4 (9th Cir. 2011) (citations omitted); *see also Harris v. Cty. of Orange*, 682 F.3d 1126, 1131 (9th Cir. 2012) ("*Iqbal* applies to Rule 12(c) motions") (citation omitted). Therefore, a motion for judgment on the pleadings "is properly granted when, taking all the allegations in the non-moving party's pleadings as true, the moving party is entitled to judgment as a matter of law." *Fajardo v. Cty. of L.A.*, 179 F.3d 698, 699 (9th Cir. 1999); *see also Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 955 (9th Cir. 2004) (when ruling on a Rule 12(c) motion, the court must "accept as true all allegations in [the plaintiff's] complaint and treat as false those allegations in the answer that contradict [the plaintiff's] allegations").

## ANALYSIS

I.  Background On Antitrust Claims Against Airport Operators

Over the last half-century, plaintiffs have frequently attempted to assert antitrust claims against airports and airport operators after unsuccessfully bidding for a lease or concession at the airport. Accordingly, before addressing Plaintiffs' claims against the County, it is helpful to provide an overview of some of the relevant caselaw.

A. **Appellate Decisions**

   1. Airline Lease Cases

In *E.W. Wiggins Airways v. Massachusetts Port Authority*, 362 F.2d 52 (1st Cir. 1966), the plaintiff was a company that had, "[f]or many years," conducted operations at Logan Airport pursuant to a lease. *Id.* at 54. Following the expiration of the lease in December 1959, the Massachusetts Port Authority—the government entity responsible for operating the airport on behalf of the state—solicited bids for a new lease. *Id.* Although the plaintiff expressed interest in renewing the lease, the Port Authority awarded it to a competitor under murky circumstances. *Id.* at 54-55.[2] In response, the plaintiff sued the Port Authority and the competitor, asserting claims under sections 1 and 2 of the Sherman Act. *Id.* at 53. The district court dismissed for failure to state a claim and the First Circuit affirmed. First, the court held the Port Authority was immune from suit under the *Parker* state-action doctrine because it "was acting as an instrumentality or agency of the state" at the time of the challenged conduct and the conduct was undertaken "pursuant to the legislative mandate imposed upon it to operate and manage the airport and establish rules and regulations for its use." *Id.* at 55-56. Second, and alternatively, the court held that an antitrust conspiracy was not "sufficiently alleged in the complaint" because "[a]ll that the plaintiff alleges is that the Authority agreed . . . [to] make [the competitor] the sole and exclusive fixed base operator at Logan . . . [and] entered into a lease with [the competitor] under which the [competitor] was to become the sole operator. These facts do not make out a case of conspiracy nor from them can any conspiracy be reasonably inferred. This was a simple agreement or arrangement. The fact that it was exclusive does not under these circumstances necessarily make it a conspiracy or illegal." *Id.* at 56.

The Tenth Circuit addressed a similar situation in *Pueblo Aircraft Service, Inc. v. City of Pueblo, Colo.*, 679 F.2d 805 (10th Cir. 1982). Between 1970 and 1977, the plaintiff

---

[2] Specifically, the alleged murky circumstances were that "early in 1960 the Authority, acting through one of its members, contacted [the competitor] and as a result of subsequent meetings the Authority and [the competitor] entered into a conspiracy under which the Authority would refuse to allow the plaintiff to remain at Logan . . . and that [the competitor] would then take over their operations and become the sole and exclusive fixed base operator at Logan." *Id.* at 54-55.

- 9 -

conducted operations at a municipal airport, which was operated by the city of Pueblo, pursuant to a lease with the City. *Id.* at 806-07. Several months before the lease was set to expire, the City initiated a "public bidding" process. *Id.* Although the plaintiff submitted a bid to extend its lease, the City accepted a bid from a competitor. *Id.* Afterward, the plaintiff brought an antitrust lawsuit against the City, the City's aviation director, and the competing company whose bid was accepted. *Id.* at 805-06. The district court granted the defendants' motion for summary judgment and the Tenth Circuit affirmed. Although the court acknowledged that municipalities are not automatically exempt from the antitrust laws under *Parker*, it held that the City was entitled to immunity because "the State of Colorado has specifically authorized the City to acquire and operate a municipal airport and [declared] that such acquisition and operation [qualify as] 'public, governmental functions, exercised for a public purpose and matters of public necessity.'" *Id.* at 807-08 (citations omitted). This statute, the court concluded, qualified as an "affirmative legislative action" by the state of Colorado that "granted City an exemption from operation of federal antitrust laws." *Id*. at 809.

A few years later, in *Montauk-Caribbean Airways, Inc. v. Hope*, 784 F.2d 91 (2d Cir. 1986), the Second Circuit reached a similar result. In 1979, the plaintiff entered into a 10-year lease with the town of East Hampton to conduct operations at a municipal airport owned by the town. *Id.* at 93. During the first few years of the lease, the plaintiff only operated during the summer. *Id.* In 1984, the plaintiff sought to begin offering off-season service, too, but the town board refused to allow the change. *Id.* In response, the plaintiff brought an antitrust lawsuit against the town, various town officials, and a competing airline that was allowed to operate during the off-season. *Id.* The district court granted the defendants' motion to dismiss and the Second Circuit affirmed, holding that the town enjoyed immunity under *Parker*'s state-action doctrine because the New York legislature had enacted various statutes that "confer authority upon municipalities to operate local airports" and these statutes amounted to a "delegation of authority . . . that municipal airport operators may enter into exclusive lease arrangements." *Id.* at 95-96. The court further

noted that, given this conclusion "that the state action doctrine bar[s] the antitrust claims against the Town of East Hampton, there is no basis for holding that [the competitor airline] conspired with the Town to violate the antitrust laws." *Id.* at 97.

The next relevant decision is *California Aviation, Inc. v. City of Santa Monica*, 806 F.2d 905 (9th Cir. 1986). In 1966, the plaintiff entered into a 30-year lease with the city of Santa Monica to lease space at the Santa Monica municipal airport. *Id.* at 907. The lease included a provision that forbade the plaintiff from selling certain petroleum products for lower prices than the City charged. *Id.* The plaintiff brought an antitrust lawsuit against the City, arguing this contractual term amounted to "unlawful price fixing and unfair competition," but the district court granted the City's motion for summary judgment and the Ninth Circuit affirmed, holding that the City was entitled to immunity under the *Parker* state-action doctrine, even though "no state statute articulates and affirmatively expresses a state policy of allowing municipalities to fix the minimum price of fuel at airports," because the California legislature had enacted other statutes that generally authorized municipalities to enter into exclusive contracts when operating airports. *Id.* at 907-08 (citation omitted).

Finally, in 2010, the First Circuit decided *Rectrix Aerodome Centers, Inc. v. Basntable Municipal Airport Commission*, 610 F.3d 8 (1st Cir. 2010). There, the plaintiff was a company that entered into a lease in 2002 to operate a hangar at a municipal airport owned by the town of Barnstable. *Id.* at 9. The counterparty to the lease was the Barnstable Municipal Airport Commission, an entity that had been created by the town and was vested under state law with "various powers relating to airport operations, including, among other things, the power[s] to lease land." *Id.* at 9 n.1. After the Commission refused to allow the plaintiff to sell jet fuel, the plaintiff asserted antitrust claims against the Commission, several of its managers and executives, and its outside counsel. *Id.* at 9. The district court granted the defendants' motion to dismiss and the First Circuit affirmed. The court began by noting that, "[a]lthough not automatically treated as states, municipal entities (like BMAC) can invoke state action immunity—as can municipal officials acting for them—if

- 11 -

they act pursuant to a 'clearly articulated and affirmatively expressed' state policy to displace competition with regulation." *Id.* at 13 (citations omitted). The court concluded that Massachusetts had enacted such a state policy by passing a statute that authorized airport commissions to "adopt rules and regulations for the use of municipal airports." *Id.* (citation omitted). The court explained that, although "[t]his may seem a rather bland basis for attributing to the state legislature a purpose to allow the suppression of competition, . . . the case law has interpreted the protection hospitably." *Id.* The court further noted that "[c]ases from other circuits have similarly found that municipal airports can benefit from state action immunity" and the "operative [statutory] language was in many cases similar." *Id.*

### 2. Taxicab Concession Cases

In *Padgett v. Louisville & Jefferson County Air Board*, 492 F.2d 1258 (6th Cir. 1974), a group of independent taxicab operators brought antitrust claims against the Louisville and Jefferson County Air Board—a "quasi-governmental agency" responsible for operating an airport in Kentucky—after the agency rejected their bids for a taxicab concession at the airport and awarded the concession to a competing company. *Id.* at 1258. The district court granted the agency's motion to dismiss and the Sixth Circuit affirmed, holding that the agency was immune from suit under *Parker* because Kentucky had "legislatively created [the agency] whose charge is, inter alia, to operate the airport. There is no question in our own minds but that the regulation of ground transportation services is necessarily incident to the management and operation of the airport facilities." *Id.* Thus, the court "conclude[d] that the Board in contracting for cab service at the airport was exercising a valid governmental function to which the antitrust laws do not apply." *Id.*

Similarly, in *Independent Taxicab Drivers' Employees v. Greater Houston Transportation Co.,* 760 F.2d 607 (5th Cir. 1985), a group of independent taxicab operators, who had submitted an unsuccessful bid to the city of Houston for an exclusive concession over passenger service at the Houston airport, brought an antitrust lawsuit against the City and the competitor who'd been awarded the concession. *Id.* at 609-10.

- 12 -

The district court granted summary judgment to the defendants and the Fifth Circuit affirmed, holding that "the City of Houston is immune from federal antitrust liability for its treatment of taxicabs at [the Houston] Airport" because the Texas legislature had enacted a statute that "specifically authorized its municipalities to grant contracts for the provision of goods and services at their airports." *Id.* at 610 (citation omitted). Although this statute did not specifically mention how cities should regulate the provision of taxicab services at airports, the court concluded its "broad phrasing is a strong indication of the state's desire to abdicate in favor of municipal prescience with regard to airport management." *Id.*

B. **District Court Decisions**

In *Hillman Flying Service, Inc. v. City of Roanoke*, 652 F. Supp. 1142 (W.D. Va. 1987), the plaintiff conducted operations at a municipal airport owned by the city of Roanoke pursuant to a lease with the City. *Id.* at 1144. Although a competing business at the airport was allowed to sell aviation fuel, the City forbade the plaintiff from doing so. *Id.* In response, the plaintiff brought an antitrust lawsuit against the City and four of its officials, as well as the competitor and one of its vice presidents, alleging that the fuel-sale prohibition was the product "of an illicit conspiracy between [the competitor] and the city" and infusing its complaint "with very serious charges of bribery, strong arm tactics, and impropriety by the defendants." *Id.* The district court granted the defendants' motion to dismiss, holding (as relevant here) that they were entitled to immunity from the plaintiff's Sherman Act claims under the *Parker* state-action doctrine. *Id.* at 1145-46. In reaching this conclusion, the court emphasized that the Virginia legislature had enacted statutes that afforded municipalities "the general authority" to operate airports. *Id.* Although these statutes did "not expressly anticipate exclusive or anticompetitive arrangements," the court concluded that "a legislature's express endorsement of anticompetitive behavior is unnecessary for a municipality's immunity under the antitrust laws." *Id.*

*Queen City Aviation, Inc. v. City of Allentown*, 1992 WL 131148 (E.D. Pa. 1992), involved similar allegations. There, the plaintiff conducted operations at a municipal

- 13 -

airport owned by the city of Allentown pursuant to a lease with the City. *Id.* at *1. When the lease expired, the City "made public a proposal package for Request for Proposals to lease" the space and ultimately accepted a bid submitted by one of the plaintiff's competitors. *Id.* In response, the plaintiff filed an antitrust lawsuit against the City, arguing—just as Plaintiffs argue here—that "[t]he bid specifications and procedures . . . were inconsistent, ambiguous, vague and contrary to law for a variety of reasons" and that the City had "exhibited an animus toward the plaintiff and . . . acted in an unfair and discriminatory manner." *Id.* The district court granted the City's motion to dismiss, noting that "plaintiff's complaint is nothing more than an expression of its disappointment that city officials, after inviting bids, decided to offer its franchise . . . to someone else." *Id.* at *2. The court elaborated that "the circumstances plaintiff alleges simply do not give rise to the level of a violation of the Sherman Act §§ 1 and 2." *Id.* at *4.

Finally, in *Deak-Perera Hawaii, Inc. v. Department of Transportation, State of Hawaii*, 553 F. Supp. 976 (D. Haw. 1983), the plaintiff was a company that provided exchange services for foreign currency. *Id.* at 978-79. For 20 years, the plaintiff was granted an exclusive concession by the Hawaii State Department of Transportation to provide such services at the Honolulu International Airport. *Id.* However, in 1982, after the plaintiff's concession expired, the department awarded the concession to a competitor, rejecting the plaintiff's bid. *Id.* In response, the plaintiff brought an antitrust lawsuit against the department and several of its executives. *Id.* at 977. The district court granted the defendants' motion for summary judgment, holding that they qualified for immunity under the *Parker* state-action doctrine because (1) the department was "legally an instrumentality of the State of Hawaii" (2) even if it were merely considered a political subdivision of the state, the state had enacted statutes authorizing the department to enter into the type of exclusive-dealing contract being challenged. *Id.* at 982-89.

II. <u>The County Is Entitled To Judgment On The Pleadings</u>

    A. **Immunity Under The State-Action Doctrine**

In their motion to dismiss, SOCAA and Shankland argued, among other things, that

- 14 -

they are entitled to immunity under the *Parker* state-action doctrine. Specifically, they argued that *Parker* is applicable here because various provisions of Arizona law authorize SOCAA to operate the Sedona Airport. (Doc. 81 at 8-10). In their response, Plaintiffs argued the state-action doctrine is inapplicable because (1) "the Arizona statutes do not state or imply that SOCAA may engage in anti-competitive conduct in administering the Sedona Airport," (2) the state of Arizona doesn't supervise SOCAA's operation of the airport, and (3) state supervision is necessary under *Parker* because SOCAA itself isn't a municipality. (Doc. 89 at 8-9.) In their reply, SOCAA and Shankland argued that (1) SOCAA qualifies as an instrumentality of the County under Arizona statutory law and caselaw, so state supervision isn't required under *Parker*, and (2) the state statutes authorizing it to run the airport don't need to specifically authorize anticompetitive behavior in order to trigger immunity under *Parker*. (Doc. 101 at 3-6.)

Although Plaintiffs have now dismissed their claims against the SOCAA defendants (Doc. 115), the potential availability of immunity under the state-action doctrine remains a relevant consideration. This is because Plaintiffs are asserting conspiracy claims against the County predicated on an agreement between the County and SOCAA to violate the antitrust laws. Thus, if the SOCAA defendants are entitled to immunity under *Parker*, Plaintiffs' claims against the County also must fail. *Montauk-Caribbean Airways*, 784 F.2d at 97 (given the conclusion "that the state action doctrine bar[s] the antitrust claims against the Town of East Hampton, there is no basis for holding that [the competitor airline] conspired with the Town to violate the antitrust laws"); *see also E.W. Wiggins Airways*, 362 F.2d at 56.[3]

The Court concludes that the SOCAA defendants are, in fact, entitled to immunity under the state-action doctrine. As noted in Part A above, courts have repeatedly invoked this doctrine when rejecting antitrust claims against airports and airport operators. When

---

[3] Additionally, although the County didn't raise the issue of *Parker* immunity in its renewed motion for judgment on the pleadings, it seems to the Court that the County would have an even stronger claim under *Parker* than SOCAA. As noted *infra*, one of Plaintiffs' arguments here is that SOCAA doesn't qualify for immunity because it's a non-governmental entity. That argument obviously wouldn't apply to the County.

the entity responsible for operating an airport is a literal arm of the state—as was the case in *Deak-Perera Hawaii* (the Hawaii Department of Transportation)—the doctrine's applicability is obvious. In contrast, when the entity is a town, city, or county, the analysis becomes more complicated and requires consideration of whether the municipality's "anticompetitive activities were authorized by the State 'pursuant to state policy to displace competition with regulation or monopoly public service.'" *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 39 (1985) (quoting *City of Lafayette, La. V. Lousiana Power & Light Co.*, 435 U.S. 389, 413 (1978)).

Such a state policy exists here. Arizona law specifically provides that "[t]he governing body of a city or town or the board of supervisors of a county may . . . [a]cquire, establish, construct, own, control, lease, equip, improve, maintain, operate and regulate airports for the use of aircraft within or outside the limits of the city, town or county." A.R.S. § 28-8411(A)(1). The only limitation on this power is that the town, city, or county may not "restrict or limit the length or width of an airstrip or runway used for the landing and takeoff of aircraft." *Id.* § 28-8411(B)(1).

Plaintiffs argue these statutes are insufficient to trigger immunity under *Parker* because they don't expressly authorize municipalities to engage in anticompetitive behavior when operating airports. This argument is unavailing. As the Supreme Court has explained, a state legislature need not "expressly state in a statute or its legislative history that the legislature intends for the delegated action to have anticompetitive effects." *Town of Hallie*, 471 U.S. at 43. Instead, the statute need only "clearly contemplate that a city may engage in anticompetitive conduct" or render such anticompetitive conduct a "foreseeable result" of what it authorizes. *Id.* at 42. *See also City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 372-73 (1991) ("We have rejected the contention that this requirement can be met only if the delegating statute explicitly permits the displacement of competition . . . . It is enough, we have held, if suppression of competition is the 'foreseeable result' of what the statute authorizes . . . .") (quoting *Town of Hallie*, 471 U.S. at 42)). Because the statutory provisions at issue here vest Arizona municipalities

with such broad authority to operate airports, they contemplate anticompetitive conduct on the part of municipal airport operators and render such conduct foreseeable. These provisions are functionally identical to many of the statutory provisions that were deemed sufficient to trigger *Parker* immunity in the cases identified in Part A above. *See, e.g.*, *Rectrix Aerodome Centers,* 610 F.3d at 13 (Massachusetts law was sufficient under *Parker*, even though it only "adopt[ed] rules and regulations for the use of municipal airports," because although "[t]his may seem a rather bland basis for attributing to the state legislature a purpose to allow the suppression of competition, . . . the case law has interpreted the protection hospitably") (citations omitted); *Pueblo Aircraft*, 679 F.2d at 807-08 (Colorado law was sufficient under *Parker* because it "specifically authorized the City to acquire and operate a municipal airport and [declared] that such acquisition and operation [qualify as] 'public, governmental functions, exercised for a public purpose and matters of public necessity'"); *Indep. Taxicab Drivers' Emps.,* 760 F.2d at 610 (Texas law was sufficient under *Parker*, even though it didn't specifically mention how cities should regulate taxicab services at airports, because the statutes' "broad phrasing is a strong indication of the state's desire to abdicate in favor of municipal prescience with regard to airport management"); *Hillman Flying Serv.*, 652 F. Supp. at 1145-46 (Virginia law was sufficient under *Parker*, even though the relevant statutes did "not expressly anticipate exclusive or anticompetitive arrangements," because they afforded municipalities "the general authority" to operate airports).

Finally, Plaintiffs are also incorrect in their assertion that the immunity analysis requires an additional step here (*i.e.,* proof of active supervision by the state) because SOCAA is a private organization, not a town or county. Under Arizona law, SOCAA is considered a "body politic" that is "exercising its powers for the benefit of the people, for the improvement of the people's health and welfare and for the increase of the people's traffic and prosperity." A.R.S. § 28-8424(A). The courts have treated such entities as functionally identical to cities, towns, and counties for purposes of the *Parker* immunity analysis. *See, e.g.*, *Rectrix Aerodome Centers,* 610 F.3d at 9 & 9 n.1, 13 (treating as a

"municipal entity" and granting immunity to the Barnstable Municipal Airport Commission, an entity that had been created by the town and was vested under state law with "various powers relating to airport operations, including, among other things, the power[] to lease land"); *Padgett*, 492 F.2d at 1258 (granting immunity to the Louisville and Jefferson County Air Board, a "quasi-governmental agency" responsible for operating an airport in Kentucky).

B. **Plausibility**

Plaintiffs' claims against the County also fail for an independent reason. The Court previously rejected those claims because "Plaintiff simply does not allege facts sufficient to demonstrate that Yavapai County did anything more than own the Sedona Airport during the RFP process." (Doc. 69 at 5.) In its renewed motion for judgment on the pleadings, the County argues the new factual allegations in the amended complaint remain insufficient to show it was part of any illicit agreement. (Doc. 79 at 9-10, 12.)[4] In their response, Plaintiffs argue their new allegations are sufficient and emphasize the allegations concerning the "communications between SOCAA's president and County Supervisor Garrison," which they contend "evidence an agreement to oust Dakota and install Guidance." (Doc. 85 at 8-11.)

The Court agrees with the County that the amended complaint remains deficient. For example, one of the new factual allegations pertaining to the County is that, on March 14, 2017, SOCAA's president (Cagliero) sent an email to a County representative (Garrison) to suggest a meeting to address SOCAA's "problem tenant." (Doc. 72 ¶ 32.) The email stated there had been "developments in the litigation that [] could be better addressed by a joint Airport Authority/Yavapai County team." (*Id.*) Plaintiffs then allege that "[i]n furtherance of the 'Airport Authority/Yavapai County team's' goal of dealing

---

[4] The County also seeks judgment on the pleadings because (1) Plaintiffs fail to allege it possessed monopoly power in the relevant market, as required for a section 2 claim and (2) Plaintiffs fail to allege a plausible "antitrust injury," as required for both a section 1 and section 2 claim. (Doc. 79 at 7-13.) Additionally, the County argues that Plaintiffs' request for injunctive relief is improper because (1) Plaintiffs have not stated a valid claim under the Sherman Act and (2) the amended complaint doesn't identify any ongoing conduct by the County that is causing or threatens to cause future harm. (*Id.* at 13.) The Court declines to reach these arguments because it is ruling in the County's favor on alternative grounds.

with the 'problem tenant,' on March 24, 2017, ten days after Cagliero emailed Garrison, SOCAA attorney Tony Cullum transmitted a letter to Dakota beginning the process of terminating the Dakota Lease." (*Id.* ¶ 33.) According to Plaintiffs, "[w]ith SOCAA and Yavapai's plan in place, SOCAA began negotiating a 'settlement' of the Litigation with Dakota." (*Id.* ¶ 34.)

But Plaintiffs also acknowledge in the amended complaint that "despite the purported requirements of the RFP, the Yavapai County Board of Supervisors . . . did not participate in the initial award decision. No one from [Yavapai County] was present at the June 26, 2017 meeting, although Yavapai County officials provided input to the RFP process and later approved the sublease." (*Id.* ¶ 73.) Plaintiffs' main allegation against the County, thus, seems to be that it "ignored a material term of the Master Lease and approved the Guidance sublease." (*Id.* ¶ 88.)

Such allegations do not plausibly suggest an illegal agreement or conspiracy between the County and any other defendants. Plaintiffs have pleaded facts showing only that an officer of SOCAA sent an email to a County official suggesting a meeting and that the County later approved the SOCAA-Guidance Sublease. Although Plaintiffs include the phrases "SOCAA and Yavapai's plan" (*id.* ¶ 34) and "Airport Authority/Yavapai County team" (*id.* ¶¶ 33, 39), they fail to include any concrete factual allegations regarding what this plan was or what this team did. Moreover, it is unremarkable that SOCAA might refer to Dakota as a "problem tenant" at the time this email was sent, given that SOCAA and Dakota were embroiled in pending civil litigation at the time. The fact such an email was sent to a County representative (who had a legitimate need to be apprised of the status of ongoing litigation), coupled with a request for a future meeting, does not give rise to a legitimate inference that the purpose of the requested meeting was to hatch a plan to violate the antitrust laws by creating a sham RFP process. *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008) ("Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws.").

- 19 -

In sum, Plaintiffs have not pleaded "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement" involving the County, given that Plaintiffs have not alleged the County had any other involvement or interaction with the other defendants regarding the sublease. *Twombly*, 550 U.S. at 556. No allegations in the complaint plausibly suggest that the County's ultimate approval of the SOCAA-Guidance Sublease resulted from any conspiracy or agreement between the County and the other defendants.

III. Scope of Dismissal

"[L]eave to amend may be denied . . . if amendment of the complaint would be futile." *Albrecht v. Lund*, 845 F.2d 193, 195 (9th Cir. 1988). "An amendment is futile when 'no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense.'" *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 656 (9th Cir. 2016) (citation omitted). Moreover, when a court has already granted the plaintiff leave to amend, the court has "particularly broad" discretion in deciding whether to grant further leave to amend. *Chodos v. W. Publ'g Co.*, 292 F.3d 992, 1003 (9th Cir. 2002) (citation omitted).

The Court denies further leave to amend here. There are no new factual allegations Plaintiffs could offer to overcome the deficiencies identified above.

Accordingly, **IT IS ORDERED** that:

1. The County's motion for judgment on the pleadings (Doc. 79) is **granted**;
2. The Amended Complaint (Doc. 72) is **dismissed with prejudice** as to the County; and
3. The Clerk of Court shall enter judgment accordingly and terminate this action.

Dated this 10th day of April, 2019.

Dominic W. Lanza
United States District Judge